UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IMAD EL KHOURY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 21-cv-11036-LTS |
| MICHAEL GOULDING <u>et</u> <u>al.</u>, | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION ON PARTIES'
<u>CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>[1]
[Docket Nos. 120, 124]

February 10, 2023

Boal, M.J.

<u>Pro</u> <u>se</u> plaintiff Imad El Khoury filed suit against Weston Police Department ("WPD") officials Michael Goulding, Efthimios Bousios, William Carlo, and Nicole Holmes in their individual capacities (collectively "the Weston Defendants"), as well as his former landlord, Oxana Cummings, alleging various federal and state law claims arising out of a disagreement with Cummings and his subsequent interactions with the Weston Defendants.  Docket No. 1-1.

The Weston Defendants have moved for summary judgment on all of El Khoury's claims against them.  Docket No. 120.  El Khoury has cross moved for summary judgment on all such claims.  Docket No. 124.  For the following reasons, I recommend that Judge Sorokin grant the Weston Defendants' motion for summary judgment and deny El Khoury's motion for summary judgment.

---

[1] On March 3, 2022, Judge Sorokin referred this case to the undersigned for full pretrial management and report and recommendations on dispositive motions.  Docket No. 93.

I.   PROCEDURAL BACKGROUND

On July 21, 2021, El Khoury filed the instant suit.  Docket No. 1.  Pursuant to 42 U.S.C.

§ 1983, El Khoury brings, against defendants Bousios and Goulding, a due process claim, a

"class of one" equal protection claim, and a conspiracy claim.  Docket No. 1-1 at 20-23.  El

Khoury asserts state law claims for abuse of process and malicious prosecution against

defendants Bousios, Goulding, and Carlo for pursuing a criminal complaint for assault and

battery against El Khoury.  Id. at 23-24.  El Khoury asserts a state law claim of assault and also a

claim under the Massachusetts Civil Rights Act ("MCRA") against defendants Holmes and

Goulding for interactions that occurred at Cummings' home when El Khoury returned to retrieve

his belongings.  Id. at 24-25.  Finally, El Khoury asserts a claim for intentional infliction of

emotional distress ("IIED") against all defendants based on the totality of the circumstances

arising from the above-described events.  Id. at 25-26.

On May 6, 2022, the Weston Defendants filed a motion for summary judgment.  Docket

No. 120.  On June 6, 2022, El Khoury filed an opposition to the Weston Defendants' motion and

a cross-motion for summary judgment.  Docket No. 124.  El Khoury also filed a motion to strike

one exhibit and one statement of fact ("SOF") filed by the Weston Defendants.  Docket No. 123.

On June 21, 2022, the Weston Defendants filed an opposition to El Khoury's motion to strike.

Docket No. 126.  On July 14, 2022, the Weston Defendants filed a reply in connection with their

summary judgment motion, as well as an opposition to El Khoury's cross-motion.  Docket No.

133.  They also moved to strike parts of El Khoury's affidavit and certain submissions regarding

the parties' joint SOF.  Docket No. 136.  On July 25, 2022, El Khoury filed an opposition to the

Weston Defendants' motion to strike and a reply in support of his cross-motion for summary

judgment.  Docket Nos. 139, 140.  He also filed a motion to, among other things, strike two

exhibits filed by the Weston Defendants.  Docket No. 138.  On August 2, 2022, the Weston

Defendants filed an opposition to El Khoury's motion to strike.  Docket No. 142.  This Court

heard oral argument on November 21, 2022.  On February 10, 2023, this Court issued a separate

report and recommendation addressing the majority of the parties' motions to strike.  Docket No.

153.[2]

II.    FACTUAL BACKGROUND[3]

    A.  The Parties

          1.  El Khoury And Cummings

On January 1, 2020, El Khoury rented a room with its own bathroom at Oxana

Cummings' house in Weston, MA.[4]  Cummings shared the common areas with El Khoury,

including the kitchen.[5]  El Khoury and Cummings' relationship was at all relevant times that of

landlord and tenant.[6]

          2.  The Weston Police Department

Defendant Michael Goulding was at all relevant times employed as the Chief of the

WPD.[7]  As Chief, Goulding had no direct involvement with Cummings, the drafting of the

summons report regarding the incident between Cummings and El Khoury or other material

---

[2] As indicated in that ruling, I reserved certain decisions with respect to the motion to strike for resolution where necessary in this decision.

[3] Because this case is before this Court on cross-motions for summary judgment, I set out any disputed facts in the light most favorable to the non-moving party.  See Ahern v. Shinseki, 629 F.3d 49, 53-54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)).  The undersigned relies on the Weston Defendants' statement of undisputed material facts ("Def. SOF"), which incorporates El Khoury's responses ("Pl. Resp.") and includes El Khoury's additional statements of material fact ("Pl. SOF"), and the Weston Defendants' responses ("Def. Resp.").  The citations to these various statements of fact refer to those as contained in the parties' unified statement of material facts at Docket No. 134.

[4] Pl. SOF ¶ 32; Def. Resp. ¶ 32.

[5] Def. SOF ¶ 2.  El Khoury only admits that starting in January 2020, he rented a room in Cummings' house and that he "used to share mainly the kitchen."  Pl. Resp. ¶ 2.

[6] Pl. SOF ¶ 33; Def. Resp. ¶ 33.

[7] Def. SOF ¶ 30; Docket No. 135-12.  Although El Khoury states that he disputes the entirety of paragraph 30, he does not actually dispute this statement.  Pl. Resp. ¶ 30.

events in this case.[8]

Amanda Broughton and defendant Nicole Holmes are employed as WPD police officers.[9] Defendant Efthimios Bousios is a WPD sergeant.[10]  Defendant William Carlo is a WPD detective and also WPD's court prosecutor.[11]

B.  The May 24, 2020 Incident

Relations between El Khoury and Cummings were civil until May 24, 2020.[12]  On Sunday, May 24, 2020 at 4:27 p.m., El Khoury complained by text that he had no hot water and could not take a shower before going to work.[13]  El Khoury had complained multiple times about the hot water situation since April 19, 2020.[14]  Accusations ensued between Cummings and El Khoury; Cummings alleged that El Khoury had damaged furniture in his room and caused leaks, which Cummings believed balanced out El Khoury's lack of hot water.[15]  The messages ended at 5:34 p.m., after Cummings texted that there seemed to be hot water in other parts of the house.[16] She asked if she could come to El Khoury's room to check the water, and El Khoury agreed.[17]

---

[8] Def. SOF ¶ 30.  Docket No 135-12 at 1.  El Khoury disputes this statement of fact, but his response either fails to provide a citation in support as required by Local Rule 56.1 or the citations provided do not support his contention that Goulding, as a supervisor, had responsibility for or signed the material documents generated by WPD in this case.  Pl. Resp. ¶ 30.

[9] Def. SOF ¶¶ 3, 18; Pl. Resp. ¶ 3.  Although El Khoury states that he disputes the entirety of paragraph 18, he does not actually dispute this statement.  Pl. Resp. ¶ 18.

[10] Def. SOF ¶ 7.  Defendant Bousios' affidavit states that he works for the "Town of Westwood's Police Department."  Docket No. 135-32 ¶ 1.  This appears to be a typographical error. Although El Khoury states that he disputes the entirety of paragraph 7, he does not actually dispute this statement.

[11] Def. SOF ¶ 26; Pl. Resp. ¶ 26.

[12] Pl. SOF ¶ 45; Def. Resp. ¶ 45.

[13] Pl. SOF ¶ 47; Def. Resp. ¶ 47.

[14] Id.

[15] Pl. SOF ¶ 48; Def. Resp. ¶ 48.

[16] Pl. SOF ¶ 50; Def. Resp. ¶ 50.

[17] Id.

1.  <u>El Khoury's Version Of The Incident</u>

When Cummings arrived at El Khoury's room, she knocked on the door.[18]  El Khoury opened the door, moved to the other side of the room, and stood by the window while Cummings entered the bathroom alone to check the water.[19]  Cummings turned the water on for a few minutes and then called El Khoury to enter the bathroom to see that the water was hot.[20]  El Khoury entered the bathroom, touched the water, and told Cummings that the water was not cold, but it was not warm enough to shower or shave, and that he got sick twice when he attempted to shower with such water.[21]  Cummings left the bathroom, while El Khoury stayed to turn off the water.[22]  El Khoury left the bathroom and found Cummings standing in his room near the upper right corner of the bed.[23]  Cummings reinitiated the dispute by arguing "that the damages she accused El Khoury of causing balanced out the lack of hot water."[24]  Cummings and El Khoury were standing about eight feet apart, with Cummings standing near the upper right corner of the bed while El Khoury stood near the window close to the lower left corner of the bed.[25]  The argument ended when Cummings said: "we are even." [26]  El Khoury replied: "I don't agree about this." [27]  Cummings then replied: "We agree to disagree", and left the room.[28]

Cummings then spent about twenty to twenty-five minutes talking with her daughter in the garden.[29]  At around 6:10 to 6:15 p.m., while El Khoury was eating in the kitchen,

---

[18] Pl. SOF ¶ 57; Def. Resp. ¶ 57.
[19] <u>Id.</u>
[20] <u>Id.</u>
[21] <u>Id.</u>
[22] <u>Id.</u>
[23] <u>Id.</u>
[24] <u>Id.</u>
[25] <u>Id.</u>
[26] <u>Id.</u>
[27] <u>Id.</u>
[28] <u>Id.</u>
[29] Pl. SOF ¶ 56; Def. Resp. ¶ 56.

Cummings came in, looked for something, then left from the kitchen door leading into the garage.[30]

## 2. Cummings' Version Of The Incident

Cummings provided the following version of events in her affidavit in support of a restraining order:[31]

> Everything was untill this morning when Imad star sending me rude and threatening massages because we had irregular hot water in the house even thoug I told him that plumber coming tomorrow.  We exchange massages about that all day and he kept on complaining and thettening me. . . . The water was warm, but no super hot.  So he continue to scream at me and damand 500$ back for inconvinean. . . . He was getting really agreavated, called me a liar and was shaking and was really loud a scary.  After that went 10-15 min He got really mad and grab my right arm! I was really scared and left his room immedeatly and came to Weston police.  My 19 y.o. daughter was in her room but got very scared because of that noice and now my kids and I afraid to come home. Pleas Help![32]

## 3. The 209A[33] Application And WPD Paperwork

On Sunday, May 24, 2020, at approximately 6:30 p.m., Cummings met with Officer Amanda Broughton at the Weston Police Station.[34]  While at the station, Cummings applied for an abuse prevention order pursuant to G. L. c. 209A.[35]  Cummings' affidavit was witnessed by Sergeant Bousios, who assisted Cummings in applying for the abuse prevention order.[36]

---

[30] Pl. SOF ¶ 59; Def. Resp. ¶ 59.

[31] This statement is reproduced as it appears in the exhibit, including typographical errors.

[32] Def. SOF ¶ 9; Pl. Resp. ¶ 9.  El Khoury appears to dispute that Cummings herself authored the affidavit in support of her application for an abuse prevention order.  His lengthy response, however, does not controvert the statement.  Indeed, he acknowledges that "Cummings authored her 2-page affidavit using a blue pen."  Pl. Resp. ¶ 9; see also Docket No. 135-19 at 10-11.

[33] This Court uses the terms "209A order," "abuse prevention order," and "restraining order" interchangeably in this report and recommendation.

[34] Pl. SOF ¶ 60; Def. Resp. ¶ 60; Def. SOF ¶ 3; Pl. Resp. ¶ 3.

[35] Def. SOF ¶ 9; Pl. Resp. ¶ 9.  El Khoury disputes that Cummings herself applied for an abuse prevention order while at the police station.  His lengthy response, however, does not controvert the statement.

[36] Def. SOF ¶ 10; Pl. Resp. ¶ 10.  El Khoury disputes that the affidavit was witnessed by Bousios but fails to provide a citation supporting his contention as required by Local Rule 56.1.

Sergeant Bousios handwrote in black pen the three pages of the application for the abuse prevention order.[37]  The name of the police officer "SGT. E.G. BOUSIOS", and the name of the police department "Weston'' are typed on the first page of the abuse prevention order.[38]

Sergeant Bousios took a photograph of Cummings' arm to document where she indicated El Khoury grabbed her.[39]  The photograph also depicts a pen.[40]  Sergeant Bousios cannot confirm whether he was the person holding the pen.[41]

Officer Broughton telephoned El Khoury at about 7:00 p.m. that evening and said that Cummings wanted to pursue criminal charges against him and that she was afraid to return to her house because El Khoury would be angry with her for going to the police.[42]  El Khoury denied that he touched Cummings during their argument.[43]  Officer Broughton told El Khoury to avoid any argument or problem with Cummings when he returned to Cummings' home.[44]  The call between Officer Broughton and El Khoury was not recorded.[45]

Officer Broughton wrote a "summons report" regarding the incident.[46]  The summons

---

[37] Pl. SOF ¶ 86; Def. Resp. ¶ 86. See Docket No. 83-7.

[38] Pl. SOF ¶ 94; Def. Resp. ¶ 94.

[39] Def. SOF ¶ 7; Pl. Resp. ¶ 7. El Khoury does not dispute that Sergeant Bousios took the picture of Cummings' arm.  Rather, he disputes the purpose for which it was taken.  El Khoury offers no admissible evidence to support his version of the purpose for taking the photograph.

[40] Pl. SOF ¶ 79; Def. Resp. ¶ 79.  The Weston Defendants dispute other portions of this paragraph, but not this part.

[41] Pl. SOF ¶ 116; Def. Resp. ¶ 116.

[42] Def. SOF ¶ 8; Pl. Resp. ¶ 8; Pl. SOF ¶¶ 75-76; Def. Resp. ¶ 75-76.  Docket No. 124-1 ¶ 19.  El Khoury asserts that the narrative's second paragraph has been altered.  Pl. SOF ¶ 76.  However, El Khoury cites only to paragraph 19, the relevant portion of which this Court has recommended Judge Sorokin strike.

[43] Id.

[44] Id.

[45] Pl. SOF ¶ 66; Def. Resp. ¶ 66.

[46] Def. SOF ¶ 5; Pl. Resp. ¶ 5 (citing to Docket No. 24-2 at 9).  El Khoury disputes that Officer Broughton wrote the report, which he asserts Sergeant Bousios significantly altered.  El Khoury does not, however, provide citations to particular parts of the record that support these assertions as required by Rule 56 of the Federal Rules of Civil Procedure.

report indicates "Arrest Date/Time: 05/24/2020 @ 1929."[47]  Officer Broughton entered her

original narrative for the incident on May 24, 2020 at 7:34 p.m.[48]  7:34 p.m. is the time at which

Officer Broughton began the report, not when she completed it.[49]  In the report, Officer

Broughton wrote:

> It should be noted that upon initial contact with Cummings, she stated that she was uninjured and I did not notice and[50] obvious markings or bruising on her arm where she indicated she had been grabbed.[51]

In the section of report that addresses any injuries to a victim, "Apparent Minor Injury," was

selected from a "pre-determined drop-down menu option within the electronic report system"

used by the WPD.[52]

One page of the report bears the description: "Narrative for Officer Amanda B.

Broughton."[53]  The header section of Officer Broughton's narrative indicates that Sergeant

Bousios' ID (474 EGB) was used to modify and approve the narrative on 05/25/2020 at 00:08

a.m., and that Sergeant Bousios added his own supplemental narrative on 05/25/2020 at 00:08.[54]

The report has only the physical or handwritten signature of Sergeant Bousios.[55]

As Officer Broughton's supervising sergeant, Sergeant Bousios is required to review and

approve her reports.[56]  He did not make any substantive modifications to the contents of the

narrative of the summons report authored by Officer Broughton.[57]  He does not recall any

---

[47] Pl. SOF ¶ 90; Def. Resp. ¶ 90.
[48] Pl. SOF ¶ 67; Def. Resp. ¶ 67.
[49] Def. Resp. ¶ 67. See Docket No. 135-32 ¶ 3.
[50] This appears to be a typographical error wherein the word "and" is used in place of the word "any."
[51] Def. SOF ¶ 6; Pl. Resp. ¶ 6; Pl. SOF ¶ 63; Def. Resp. ¶ 63.
[52] Def. SOF ¶ 6; Pl. Resp. ¶ 6. See Docket No. 141-6 at 2.
[53] Docket No. 141-6 at 3.
[54] Pl. SOF ¶¶ 71, 77; Def. Resp. ¶¶ 71, 77.
[55] Pl. SOF ¶ 72; Def. Resp. ¶ 72.
[56] Pl. SOF ¶ 68; Def. Resp. ¶ 68.
[57] Id.

specific modifications he made but he may have corrected some spelling and/or grammar contained in the narrative prior to approving the report.[58]  Per Sergeant Bousios, whenever an incident report is opened, and approved by a supervisor, the WPD's electronic report system indicates that the report was "'modified,' regardless of whether content was changed."[59]  The second page of the report bears the description: "Supplemental Narrative for Sergeant Efthimios G. Bousios."[60]

Because it was after business hours, and due to COVID-19 protocols, Sergeant Bousios telephoned the on-call judge, the Honorable Michael Pomarole regarding Cummings' request for an abuse prevention order.[61]  The conversation was not recorded.[62]  Sergeant Bousios read Judge Pomarole the complete contents of Cummings' signed affidavit and described the living arrangements between El Khoury and Cummings.[63]  Sergeant Bousios also described the relevant facts relayed to him by Cummings and Officer Broughton and may have also summarized for Judge Pomarole the contents of the summons report narrative written by Officer Broughton.[64]  Cummings did not speak to the on-call judge while in the police station.[65]

Judge Pomarole issued the abuse prevention order at approximately 8:00 p.m. on May 24,

---

[58] Id.
[59] Id.
[60] Docket No. 141-6 at 4.
[61] Def. SOF ¶ 11.  Docket No. 135-3 at 2.  El Khoury's response is based on hearsay statements from Clerk-Magistrate Poitrast which this Court has recommended that Judge Sorokin strike.  In addition, El Khoury has not presented any admissible evidence to support the other statements in his response.  Therefore this statement of fact is deemed admitted.
[62] Pl. SOF ¶ 97; Def. Resp. ¶ 97.
[63] Def. SOF ¶ 11.  Docket No. 135-3 at 2.  El Khoury's response is based on hearsay statements from Clerk-Magistrate Poitrast which this Court has recommended that Judge Sorokin strike.  In addition, El Khoury has not presented any admissible evidence to support the other statements in his response.  Therefore this statement of fact is deemed admitted.
[64] Id.
[65] Pl. SOF ¶ 85; Def. Resp. ¶ 85.

2020.[66]  The order required El Khoury to vacate Cummings' residence.[67]  Sergeant Bousios

affixed the digital signature of the WPD on the order but he does not "recall the process

involved."[68]  He also affixed his physical signature below the digital signature.[69]  Sergeant

Bousios stated that after filling out the abuse prevention order form in accordance with Judge

Michael Pomarole's issuance of the order, "I printed the order and affixed my physical signature

to the document below the words 'Weston Police' in order to demonstrate that I was the officer

at the Weston Police Department who had spoken with Judge Michael Pomarole and that I had

filled out the form."[70]

At approximately 8:00 p.m. on May 24, 2020, Officer Broughton telephoned El Khoury

again.[71]  She asked El Khoury to head immediately to the Weston Police Station.[72]  When El

Khoury arrived, Officer Broughton handed El Khoury the emergency abuse prevention order,

explained a few things related to the order, and told El Khoury to look for future mail from the

court.[73]

The last paragraph of Officer Broughton's narrative is as follows:[74]

> The judge approved the application for the abuse prevention order against Elkhoury
> at 20:00 hours. I called Elkhoury back and instructed him to come straight to the
> police station in order to be served and informed him of the restrictions now in
> place. He stated he understood and would come to the station as soon as he could

---

[66] Def. SOF ¶ 13. Docket No. 135-3 at 2; Docket No. 135-6 at 2. El Khoury's response is based
on hearsay statements from Clerk-Magistrate Poitrast which this Court has recommended that
Judge Sorokin strike.  In addition, El Khoury has not presented any admissible evidence to
support the other statements in his response.  Therefore this statement of fact is deemed
admitted.

[67] Def. SOF ¶ 14. Docket No. 135-6 at 1.  El Khoury states that the "Weston Police authorized
the issuance" of the order but fails to provide a citation to support that statement.  Pl. Resp. ¶ 14.

[68] Pl. SOF ¶ 91; Def. Resp. ¶ 91.

[69] Id.

[70] Docket No. 135-3 at 1.  Pl. SOF ¶ 95; Def. Resp. ¶ 95.

[71] Def. SOF ¶ 16; Pl. Resp. ¶ 16.

[72] Id.

[73] Id.

[74] This statement is reproduced as it appears in the exhibit, including typographical errors.

as he was in Boston driving for Lyft. The order allows Elkhoury to be escorted to the residence to grab some belongings and then vacate. At the time of this report, Sgt. Bousios and I are awaiting Elkhoury's arrival to the station. I informed Cummings of the approval and that we will call her when we are coming to the house so she can leave for the time being. There is nothing further to report at this time.[75]

The events described in these lines took place on May 24, 2020 at or after 8:00 p.m.[76]

Sergeant Bousios faxed an eleven-page document on May 25, 2020 at 12:18 a.m.[77] to the Waltham District Court.[78] El Khoury describes the eleven pages as follows: (1) transmission verification report (1 page); (2) summons report (4 pages); (3) the last page of the abuse prevention order (1 page); and (4) application for an abuse prevention order, including a two-page affidavit authored by Oxana Cummings (5 pages).[79]

The summons report that was faxed and filed with the Waltham District Court has only the physical signature of Sergeant Bousios.[80]   The offense included in that summons report was

---

[75] Pl. SOF ¶ 73; Def. Resp. ¶ 73.  Docket No. 135-18 at 11.  El Khoury maintains that this portion of the paragraph was added.  Pl. SOF ¶ 73.  The Weston Defendants deny this statement to the extent that it implies that anyone other than Broughton wrote the narrative in her summons report.  Def. Resp. ¶ 73.

[76] Id.

[77] El Khoury's statement of fact says "12:18 pm" rather than 12:18 a.m.  Pl. SOF ¶ 82.  This appears to be a typographical error.  See Docket No. 135-19 at 1; see also Docket No. 135-18 at 7-8 (containing one fax stamp from May 25, 2020 at 12:18 a.m. at the bottom of the page and one fax stamp from June 1, 2020 at 12:31 p.m. at the top of the page).

[78] Pl. SOF ¶ 82; Def. Resp. ¶ 82.

[79] Pl. SOF ¶ 83; Def. Resp. ¶ 83.  El Khoury disputes that the third page of the abuse prevention order was faxed to the Waltham District Court on May 25, 2020 at 12:18 a.m.  Pl. SOF ¶ 84.  In support of this contention, El Khoury points to a different copy of the first two pages of the abuse prevention order which bear footers indicating that they were faxed on May 25, 2020 at 12:18 a.m.  See Pl. SOF ¶ 84 (citing to Docket No. 24-2 at 7-8).  The footer indicates that they are pages 02/11 and 03/11.  Docket No. 24-2 at 7-8.  The next page, which is not the third page of the abuse prevention order, shows a footer indicating page 06/11.  Id. at 9.  It appears then, that pages 04/11 and 05/11 are missing from that version of the document.  Without the missing pages, it is unclear whether the third page of the abuse prevention order was included in the fax. In any event, the Weston Defendants admit that the documents referenced in Pl. SOF ¶ 83 are, in fact, the documents that the Weston Defendants provided to the Waltham District Court on May 25, 2020.

[80] Pl. SOF ¶ 78; Def. Resp. ¶ 78.

"Assault and Battery".[81]  The abuse prevention order issued against El Khoury was stamped as received by the Waltham District Court on May 26, 2020.[82]

A hearing on the 209A order was scheduled at the Waltham District Court for June 1, 2020.[83]  On that date, the hearing was postponed until August 12, 2020 to allow El Khoury to obtain counsel.[84]  The 209A order was extended by agreement of the parties until the same date.[85]  On August 12, 2020, the order expired and was not renewed.[86]

     C.  The June 2, 2020 Incident

On the evening of June 2, 2020, El Khoury, accompanied by members of the WPD, went to Cummings' house to pick up his belongings.[87]  Defendant Officer Nicole Holmes insisted that El Khoury take no more than fifteen minutes, and, if he needed longer than that, he should arrange for another time to finish.[88]  Officers Altieri and Holmes accompanied El Khoury to Cummings' home.[89]  Cummings was present when they arrived.[90]  Officer Altieri accompanied El Khoury while they were inside the property to assist and ensure the safety of all individuals.[91]  During that time, Oxana Cummings sat at the kitchen table with a man.[92]  Officer Holmes mostly

---

[81] Pl. SOF ¶ 110; Def. Resp. ¶ 110.

[82] Docket No. 24-2 at 7.  See Pl. SOF ¶ 98; Def. Resp. ¶ 98.

[83] Def. SOF ¶ 17; Pl. Resp. ¶ 17.

[84] Def. SOF ¶ 17. El Khoury disputes other parts of this statement, but not this portion.

[85] Def. SOF ¶ 17; Pl. Resp. ¶ 17.  See also Docket No. 135-18 at 8.  Although El Khoury states that he disputes the entirety of paragraph 17, he does not actually dispute this statement.  Pl. Resp. ¶ 17.

[86] Def. SOF ¶ 17.  El Khoury disputes other parts of this statement, but not this portion.

[87] Pl. SOF ¶ 125; Def. Resp. ¶ 125.

[88] Id.

[89] Def. SOF ¶ 18; Pl. Resp. ¶ 18; Pl. SOF ¶ 126; Def. Resp. ¶ 126.

[90] Def. SOF ¶ 19.  Docket No 135-7 at 2.  El Khoury disputes portions of this statement, but not this particular fact.

[91] Id.

[92] Pl. SOF ¶ 126; Def. Resp. ¶ 126.  In his statement of fact, El Khoury makes assertions relating to the man's identity.  Pl. SOF ¶ 126.  This Court has recommended that those statements be struck.  In any event, the man's identity is not material to any of El Khoury's claims regarding the June 2, 2020 incident.

remained in the downstairs kitchen area while Officer Altieri was upstairs with El Khoury.[93]
While El Khoury was moving his belongings from his rented room on the second floor to his car,
Officer Altieri followed a few feet behind him.[94]

   While he was in Cummings' house, El Khoury states that Officer Holmes stood between
the kitchen table and the path that leads from the stairs into the kitchen and then to the door of
the garage that El Khoury was using to move his things to the car.[95]   El Khoury asserts that he
was about to remove his belongings from a kitchen closet when

> Officer Holmes seemed to get "anxious", and started yelling and moving in an
> intimidating way to the other side of the table (to the side where Cummings was
> sitting), and she called officer Altieri to get close to the plaintiff, which he did.
> When Officer Holmes was acting in the way just described, Plaintiff saw
> Cummings and [the man El Khoury believed to be] Captain Kelly suddenly putting
> their heads down on the table/bar, and there was a loud noise coming from the plates
> and glasses. Plaintiff felt at that moment that Officer Holmes was going to shoot
> him. While taking his stuff from the closet, Plaintiff was able to stay calm, kept his
> hands in a way anyone can see them, avoided any "sudden moves", and continued
> to talk slowly about the stuff he was taking from the closet. Plaintiff did not dare to
> look back; Plaintiff is not sure if Officer Holmes was pointing her gun at him while
> he was taking his stuff from the closet, since she was standing behind him.[96]

   El Khoury further states that at one point while he was coming down the stairs, Holmes
jumped in front of him and "willfully blocked" his way.[97]   El Khoury asserts that when that
occurred, Officer Holmes was standing on the first floor near the end of the stairs, and El Khoury
was descending the stairs quickly while carrying some light objects in his right hand.[98]   El
Khoury contends that during this interaction, Officer Holmes had her right hand on her gun.[99]

---

[93] Def. SOF ¶ 20; Pl. Resp. ¶ 20.  Docket No 135-7 at 2.
[94] Pl. SOF ¶ 127; Def. Resp. ¶ 127.
[95] Id.
[96] Pl. Resp. ¶ 22.  El Khoury's response is reproduced as it appears in the parties' joint statement
of facts, including typographical errors.  See also Docket No. 124-1 ¶¶ 23, 25.
[97] Pl. SOF ¶ 128.  Docket No. 124-1 ¶¶ 23, 25.
[98] Id.
[99] Id.

Officer Holmes states that she did not jump in front of El Khoury to block his way.[100] Rather, she maintains that she "heard what sounded like loud objects being thrown around" and went to check on the noise.[101]  As she was going up the stairs, El Khoury came down the same set of stairs quickly and went around her.[102]  Officer Holmes also maintains that she did not threaten El Khoury in any way.[103]  Further, she asserts that she never pulled her firearm or had any reason to do so.[104]

### D.  The Criminal Complaint Application

As a result of the incident on May 24, 2020, defendant Detective Carlo filed with a clerk-magistrate at the Waltham District Court an application for a criminal complaint for assault and battery by El Khoury against Cummings.[105]  The document is dated May 26, 2020 and was docketed on July 14, 2020.[106]  Detective Carlo's submission included the summons report and the photo of Cummings' arm.[107]

### E.  The Expungement Of The Abuse Prevention Order

On September 11, 2020, El Khoury filed a motion with the Waltham District Court to expunge the 209A order.[108]  Judge Sara Ellis ruled as follows:

> After reconsideration of the evidence presented, the relationship of the parties was a landlord-tenant relationship, and not a qualifying G.L. c. 209A relationship.  The order that issued 6/1/2020 was by agreement of both the plaintiff and the defendant via telephone hearing in the interests of justice, including consideration of the pro

---

[100] Def. SOF ¶ 21.  Docket No 135-7 at 3.
[101] Docket No 135-7 at 2-3.
[102] Def. SOF ¶ 21.  Docket No 135-7 at 1-3.
[103] Def. SOF ¶ 22.  Docket No 135-7 at 1-3.
[104] Def. SOF ¶ 23.  Docket No 135-7 at 1-3.
[105] Def. SOF ¶ 26; Pl. Resp. ¶ 26.  See Docket No. 135-11 at 1.
[106] Docket No. 135-8 at 1; Docket No. 135-9 at 2.
[107] Pl. SOF ¶ 111; Def. Resp. ¶ 111.  Docket No 135-11 at 1.
[108] Docket No. 135-15.  The Weston Defendants note that they became aware of documents relating to the expungement for the first time when El Khoury filed them as part of his opposition to their summary judgment motion and therefore are unable, due to the apparent expungement, to admit or deny the contents of Judge Ellis' order.  Def. Resp. ¶ 102.

se defendant asking for additional time during the COVID-19 pandemic to obtain counsel, and the fact that the defendant vacated the residence at issue, and the plaintiff did not seek an extension of the order, the order is hereby void ab initio as of 6/1/20.  Motion to expunge is hereby allowed.[109]

F.  El Khoury's Telephone Conversation With Detective Carlo

On November 9, 2020, El Khoury spoke on the telephone with Detective William Carlo who, without any request from El Khoury, pulled the summons report and started reading the incident narrative.[110]  While he was reading, Detective Carlo suddenly stopped on the "not" when he was reading the statement in which Officer Broughton stated that she "did not notice any obvious markings or bruising on the arm of Oxana Cummings."[111]  During the same phone call, Detective Carlo refused El Khoury's request to produce Officer Broughton as a witness for the show cause hearing.[112]

G.  The May 14, 2021 Hearing

On or about May 14, 2021, a hearing was held before a clerk-magistrate at the Waltham District Court at which both El Khoury and Cummings testified.[113]  Prior to the hearing, El Khoury had applied for a criminal complaint against Cummings on the basis that she filed a false police report.[114]

When asked about the photo of Cummings' arm in the hearing, Detective Carlo stated that he was not sure what the photo depicted and that it was not attached to the summons report that he had brought to the hearing.[115]  At the hearing, the clerk-magistrate found probable cause

---

[109] Docket No. 135-15 at 1.
[110] Pl. SOF ¶ 113; Def. Resp. ¶ 113.
[111] Id.
[112] Pl. SOF ¶ 114; Def. Resp. ¶ 114.
[113] Def. SOF ¶ 27; Pl. Resp. ¶ 27.
[114] Id.
[115] Pl. SOF ¶ 112; Def. Resp. ¶ 112.

to charge El Khoury with the crime of assault and battery on Cummings.[116]  He did not find

probable cause to charge Cummings.[117]  Despite the clerk-magistrate's finding, Detective Carlo,

with the agreement of Cummings' counsel, indicated that the WPD was satisfied with no

criminal complaint issuing against El Khoury.[118]  No criminal complaint did issue against him.[119]

El Khoury was never arrested or charged with any crime.[120]

     H.   El Khoury's Health

     El Khoury maintains that the Weston Defendants' actions have caused him emotional

distress and exacerbated his pre-existing health conditions.[121]  El Khoury has taken blood

pressure medication since December 2019, and his health situation was "stable" prior to the May

24, 2020 incident.[122]  During the remaining part of 2020 and until after the May 14, 2021

hearing, El Khoury's blood pressure readings were significantly elevated, and he experienced

dizziness, a lack of energy, headaches, and numbness.[123]  Surprised by the elevated readings, El

Khoury's primary doctor recommended that he purchase a monitor and measure his blood

pressure daily.[124]  After May 14, 2021, El Khoury's blood pressure readings gradually started to

---

[116] Def. SOF ¶ 28.  Docket No 135-11 at 2; Docket No 135-8; Docket No. 135-9.  El Khoury disputes this statement of fact.  Pl. Resp. ¶ 28.  However, his response is based on inadmissible statements about a telephone call with Clerk-Magistrate Poitrast that do not contravene the fact at issue.

[117] Def. SOF ¶ 28.  El Khoury disputes other parts of this statement of fact, but not this portion. Pl. Resp. ¶ 28.

[118] Def. SOF ¶ 29.  Docket No 135-11 at 2. El Khoury disputes this fact but fails to provide a citation in support as required by Local Rule 56.1.  Pl. Resp. ¶ 29.

[119] Id.

[120] Def. SOF ¶ 24.  Docket No 135-3 at 3.  El Khoury disputes this statement of fact.  Pl. Resp. ¶ 24.  However, the citations that he offers do not show that he was ever placed under arrest. Although El Khoury disputes the entirety of this statement of fact, he does not, in fact, dispute that he was never charged with a crime.  Pl. Resp. ¶ 24.

[121] Pl. SOF ¶ 130; Def. Resp. ¶ 130 (admitted for purposes of summary judgment only).

[122] Id.

[123] Id.

[124] Id.

return to their pre-May 24, 2020 levels.[125]  Over the same period of time, El Khoury states that

he lost enjoyment in life, withdrew from social and community activities, and cut down on his

hours at work.[126]

III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  An issue is "genuine" when a rational factfinder could resolve it in either

direction.  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010) (citation

omitted).  A fact is "material" when its (non) existence could change a case's

outcome.  Id. (citation omitted).  This Court takes the facts from the parties' summary judgment

filings and from the record at large where appropriate.  See Evergreen Partnering Grp., Inc. v.

Pactiv Corp., 832 F.3d 1, 4 n.2 (1st Cir. 2016).

The moving party bears the initial burden of establishing that there is no genuine issue of

material fact.   See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If that burden is met, the

opposing party can avoid summary judgment only by providing properly supported evidence of

disputed material facts that would require trial.  See id. at 324.  "[T]he non-moving party 'may

not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts

showing that there is a genuine issue for trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841

(1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  The non-

moving party must produce evidence that is "significant[ly] probative."  Borges, 605 F.3d at

5 (citing Anderson, 477 U.S. at 249).

The Court "must scrutinize the evidence in the light most agreeable to the nonmovants,

---

[125] Id.
[126] Id.

who are entitled to the benefit of all reasonable inferences therefrom." <u>Ahern</u>, 629 F.3d at 53-54 (citing <u>Cox</u>, 391 F.3d at 29).  "A properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." <u>Id.</u> (citations omitted).  Indeed, "[a]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." <u>McRory v. Spigel (In re Spigel)</u>, 260 F.3d 27, 31 (1st Cir. 2001) (citation omitted).  "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." <u>Walsh v. Town of Lakeville</u>, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se." <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996) (citation omitted).  "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Id.</u> (citation omitted).  "Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." <u>Estate of Hevia v. Portrio Corp.</u>, 602 F.3d 34, 40 (1st Cir. 2010) (citing <u>Blackie v. Maine</u>, 75 F.3d 716, 721 (1st Cir. 1996) ("Barring special circumstances, the <u>nisi prius</u> court must consider each motion separately, drawing inferences against each movant in turn.")).

To ensure <u>pro se</u> pleadings are given fair and meaningful consideration, courts should hold such pleadings "to a less stringent standard than those drafted by lawyers and liberally construe them in favor of the <u>pro se</u> party." <u>Rossop v. Bank of Am. Corp.</u>, No. 13-CV-112-PB, 2013 WL 6633986, at *2 (D.N.H. Dec. 17, 2013) (citations omitted).

IV.   <u>DISCUSSION</u>

A.   <u>Section 1983 Claims</u>

El Khoury alleges a due process violation, a "class of one" equal protection violation, and conspiracy against defendants Bousios and Goulding pursuant to 42 U.S.C. § 1983.  Docket No. 1-1 at 20-23.  Liberally construed, El Khoury's claims are based on Bousios' alleged failure to follow proper procedures on May 24, 2020 and falsified documents when assisting Cummings with her application for a 209A order against El Khoury.  Specifically, El Khoury alleges that Bousios (1) did not have Cummings speak with the on-call judge; (2) did not speak with the on-call judge himself; (3) signed the 209A order instead of the judge; and (4) improperly applied for the 209A order because El Khoury had a landlord-tenant, as opposed to romantic, relationship with Cummings.  <u>Id.</u>

Section 1983 is a vehicle through which individuals may sue certain persons acting under the color of state law for deprivation of federally assured rights.  <u>Gagliardi v. Sullivan</u>, 513 F.3d 301, 306 (1st Cir. 2008).  Specifically, Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989).

"A claim under Section 1983 has two essential elements.  First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law."  <u>Soto v. Flores</u>,

103 F.3d 1056, 1061 (1st Cir. 1997).

"It is axiomatic that the liability of persons sued under § 1983 in their individual capacities must be gauged in terms of their own actions." Turkowitz v. Town of Provincetown, 914 F. Supp. 2d 62, 70 (D. Mass. 2012) (citation and quotation marks omitted). "Individual police officers can be liable only if the individual officer personally participated in the alleged violation." Prall v. City of Bos., 985 F. Supp. 2d 115, 120 (D. Mass. 2013).

      1.  Supervisory Liability

With respect to his Section 1983 claims against defendant Chief Goulding, El Khoury argues that the Weston Police's digital signature on the abuse prevention order "is the responsibility of Chief Goulding who represented the Weston Police Department at all relevant times." Docket No. 124 at 3, 16. El Khoury also contends that Bousios "should have got the permission from Michael Goulding" to include the Weston Police's signature on the order. Docket No. 1-1 at 22. He claims that Goulding "directed Bousios to issue the 209A" order. Id. at 23. As a result, El Khoury asserts that Goulding is liable under Section 1983.

"[I]n order to hold a supervisor liable under Section 1983, the supervisor's behavior must be affirmatively linked to the constitutional violations of his or her subordinates, such that it could be deemed supervisory encouragement, condonation or acquiescence, or gross negligence . . . amounting to deliberate indifference." McClinton v. Suffolk Cnty. Jail, 569 F. Supp. 3d 71, 79 (D. Mass. 2021) (citation and quotation marks omitted).

The First Circuit has held that

> [a]lthough a supervisor need not personally engage in the subordinate's misconduct in order to be held liable, his own acts or omissions must work a constitutional violation. Facts showing no more than a supervisor's mere negligence vis-á-vis his subordinate's misconduct are not enough to make out a claim of supervisory liability. At a minimum, the plaintiff must allege facts showing that the supervisor's conduct sank to the level of deliberate indifference.

Id. at 15.

Goulding states that he did not participate personally in the conduct that El Khoury alleges deprived him of his rights under Section 1983.  Docket No. 121 at 8, 9, 12.  He had no direct involvement with Cummings, the drafting of the summons report, the application for the abuse prevention order, the criminal complaint, or the probable cause hearing at Waltham District Court.[127]  In addition, El Khoury has not provided facts sufficient to show that Goulding was on notice of any subordinate's misconduct.[128]  Accordingly, on this basis alone, this Court recommends that Judge Sorokin grant the Weston Defendants' motion for summary judgment as to El Khoury's three Section 1983 claims against Goulding.

### 2.   Count I - 14th Amendment Violation (Due Process Claim)

El Khoury's due process claim is based on an allegation that Sergeant Bousios falsified parts of documents and failed to follow the appropriate process for an abuse prevention order against El Khoury.  Docket No. 1-1 at 21-22.  For example, El Khoury alleges that Cummings and Bousios never spoke to the on-call judge.  Id. at 21.  He also alleges that the Weston Defendants "decided to delegate to themselves the judicial powers granted to the on-call judge to issue a 209A, as evidenced by the digital signature of Weston Police on the Restraining Order, along with the signature of Efthimios Bousios who performed the digital signature."  Id. at 21-22.

The Due Process Clause of the Fourteenth Amendment, which prohibits a state from

---

[127] Def. SOF ¶ 30.  Docket No 135-12 at 1.

[128] El Khoury contends that "[a]ffixing the digital signature of Weston Police on the Order is the responsibility of Chief Goulding. Also, since the complainant/Applicant in the 'Application for criminal complaint' is Weston Police Department, then it follows that Chief Goulding holds responsibility for filing the application for criminal complaint against the Plaintiff."  Pl. Resp. ¶ 30.  El Khoury, however, provides no citation for these statements, and this Court will not consider them.

depriving any person of life, liberty, or property without due process of law, has both a substantive and a procedural component.  Martini v. City of Pittsfield, C.A. No. 14-30152, 2015 WL 1476768, at *6 (D. Mass. 2015); see also U.S. Const. Amend. XIV, § 1.  The procedural component requires that there be notice and opportunity for a hearing before a person is deprived by state action of a protected property interest.  Logan v. Zimmerman, 455 U.S. 422, 428 (1982); Fuentes v. Shevin, 407 U.S. 67, 96-97 (1972) (before a state can assist a secured creditor in repossession of a debtor's property, there must be notice and a prior hearing).  The substantive component applies where state conduct is so brutal, demeaning, and harmful that it shocks the conscience.  Martini, 2015 WL 1476768, at *7.

"Chapter 209A provides that a person suffering abuse from a family or household member may file a complaint in the Superior, Probate and Family, or District/Municipal court requesting protection against such abuse."  Nollet v. Justs. of Trial Ct. of Com. of Mass., 83 F. Supp. 2d 204, 207 (D. Mass.), aff'd sub nom., Nollet v. Justs. of Trial Ct. of Com. of Massachusetts, 248 F.3d 1127 (1st Cir. 2000) (citing Mass. Gen. L. ch. 209A, § 3).  A 209A order may be used even in the absence of a romantic relationship.  Tabia v. Dekeon, No. CV 19-11132-LTS, 2019 WL 2578277, at *2 (D. Mass. June 24, 2019).

The Nollet court described the procedure for obtaining such an order:

If the 209A petitioner proves the existence of such abuse by a preponderance of the evidence, the court may then issue an order imposing significant restrictions on the defendant.  Although the Court is free to fashion whatever remedy it deems appropriate, the statute enumerates a number of specific orders which the Court may issue, including: ordering the alleged abuser to vacate the household abode . . . .

A court can issue a temporary order granting the remedies provided in ch. 209A, § 3, without giving the alleged abuser notice and an opportunity to be heard, provided that the petitioner files a complaint and demonstrates "a substantial likelihood of immediate danger of abuse."  If the court does issue an ex parte temporary order under Section 4, the court must then give the defendant the opportunity to be heard on the question of continuing the temporary order within ten (10) business days

22

after the issuance of the <u>ex parte</u> order.

<u>Nollet</u>, 83 F. Supp. 2d at 207 (citing Mass. Gen. L. ch. 209A, § 4, additional citations omitted).

When a court is closed for business, a court department "may grant relief to the plaintiff as provided under section four if the plaintiff demonstrates a substantial likelihood of immediate danger of abuse." Mass. Gen. L. ch. 209A, § 5. "In the discretion of the justice, such relief may be granted and communicated by telephone to an officer or employee of an appropriate law enforcement agency . . . ." <u>Id.</u>[129]

El Khoury's due process claim depends in part on his allegation that the WPD authorized the 209A order, not Judge Pomarole. In support of his contention, El Khoury asserts that

> the on-call judge would not have proceeded with conducting the hearing if he knew that the relationship between the two parties is one of a "landlord-tenant", a fact clearly mentioned in the affidavit of Cummings and in the police report. Such outrageous issuance of a 209A demonstrates that "the on-call judge" did not speak directly to Oxana Cummings and did not conduct a hearing over the phone, as he should have done, according to the "Guidelines for Judicial Practice: Abuse Prevention Proceedings", and that is what explains why Weston Police digitally signed the restraining order on May 24, 2020 at about 8:00 p.m.

Docket No. 1-1 at 8-9.

El Khoury's assertions, however, are not supported by sufficient evidence for a reasonable juror to conclude that El Khoury's claims are true.[130] The undisputed facts are as

---

[129] To the extent that El Khoury claims that the 209A process itself violated his civil rights, the First Circuit has found otherwise. Individuals are not deprived of clearly established rights guaranteed by the United States' laws or the Constitution through the issuance of a 209A order. <u>Nollet</u>, 83 F. Supp. 2d at 211 (citing <u>Rodriguez–Cirilo v. Garcia</u>, 115 F.3d at 52). "The <u>ex parte</u> procedure of ch. 209A, § 4 is constitutional because it provides the due process protections that are necessary before the state may deprive an individual of the constitutionally protected liberty and property interests that are at stake when a temporary restraining order is issued in a domestic abuse action." <u>Id.</u>

[130] Nor are they legally accurate. An abuse prevention order is legally feasible where the relationship at issue is one of landlord-tenant. <u>See</u> <u>Tabia</u>, 2019 WL 2578277, at *2.

follows: Judge Pomarole issued the abuse prevention order at approximately 8:00 p.m. on May 24, 2020.[131]  Sergeant Bousios affixed the digital signature of the WPD on the order but he does not "recall the process involved."[132]  Sergeant Bousios stated that after filling out the abuse prevention order form in accordance with Judge Michael Pomarole's issuance of the order, "I printed the order and affixed my physical signature to the document below the words 'Weston Police' in order to demonstrate that I was the officer at the Weston Police Department who had spoken with Judge Michael Pomarole and that I had filled out the form."[133]  The undisputed statements of material fact show that the judge issued the 209A order after an appropriate process.  El Khoury points to numerous issues with respect to the documents.  However, none of these issues either individually or collectively present sufficient evidence to support a due process violation.

In addition, after construing the evidence in the light most favorable to El Khoury, this Court finds that he has not established that he was denied procedural due process.  Indeed, El Khoury had abundant notice and opportunity to be heard.  He received notice of the order on the day it was issued.[134]  He then attended a hearing on June 1, 2020.[135]  At that hearing, El Khoury requested and received a continuance to hire counsel.[136]  The order was extended until August 12, 2020, the date of the next scheduled hearing.[137]  On August 12, 2020, the order expired and was not renewed.[138]  Nor has El Khoury shown, based on the undisputed facts of record, that the officers' conduct is so brutal, demeaning, and harmful that it shocks the conscience.

---

[131] Def. SOF ¶ 13. Docket No. 135-3 at 2; Docket No. 135-6 at 2.

[132] Pl. SOF ¶ 91; Def. Resp. ¶ 91.

[133] Docket No. 135-3 at 1.  Pl. SOF ¶ 95; Def. Resp. ¶ 95.

[134] Def. SOF ¶ 16; Pl. Resp. 16.

[135] Def. SOF ¶ 17; Pl. Resp. 17.

[136] Def. SOF ¶ 17; Docket No. 138-18 at 8.

[137] Def. SOF ¶ 17; Pl. Resp. 17.

[138] Id.

Accordingly, this Court recommends that Judge Sorokin grant the Weston Defendants'

motion for summary judgment as to El Khoury's due process claim.

### 3.   Count II – 14th Amendment Violation (Equal Protection Claim)

El Khoury alleges that Bousios, at Goulding's direction, intentionally treated him

differently than other "similarly situated" individuals by failing to follow the proper procedures

for obtaining an abuse prevention order.  Docket No. 1-1 at 23.  Rather, he alleges that Oxana

Cummings never talked to the on-call judge, and Bousios altered the original incident report to

charge a false crime.  Id.  The purpose of such conduct allegedly was to help Cummings evict El

Khoury.  Id.

A "class of one" equal protection claim is "a claim in which the plaintiffs do not claim

membership in a class or group, but assert that the defendants impermissibly singled them out for

unfavorable treatment."  SBT Holdings, LLC v. Town Of Westminster, 547 F.3d 28, 33 (1st Cir.

2008).  To establish a "class of one" equal protection violation, El Khoury must allege that

"compared with others similarly situated [he] was selectively treated . . . based on impermissible

considerations such as . . . intent to inhibit or punish the exercise of constitutional rights, or

malicious or bad faith intent to injury a person."  Barrington Cove, LP v. R.I. Hous. & Mortg.

Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001) (internal quotation marks, citation, and emphasis

omitted); see also Cordi-Allen v. Conlon, 494 F.3d 245, 250 (1st Cir. 2007) (plaintiffs must

allege that they have been "intentionally treated differently from others similarly situated and

that there is no rational basis for the difference in treatment.").

The test for whether a plaintiff has shown that individuals are similarly situated is

"whether a prudent person, looking objectively at the incidents, would think them roughly

equivalent and the protagonists similarly situated."  Barrington Cove, 246 F.3d at 8 (internal

quotation marks and citations omitted).  "Exact correlation is neither likely or necessary, but the

cases must be fair congeners.  In other words, apples must be compared to apples."  Id.
Although the determination as to whether parties are similarly situated is a "fact-bound inquiry"
this does not mean "that every case, regardless of the proof presented, is a jury case."  Cordi-
Allen, 494 F.3d at 251.  A plaintiff must identify the similarly situated individuals and
circumstances to "a high degree."  Rectrix Aerodrome Centers, Inc. v. Barnstable Municipal
Airport Comm'n, 610 F.3d 8, 16 (1st Cir. 2010).  El Khoury must "first identify related specific
instances where persons situated similarly in all relevant respects were treated differently,
instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for
unlawful oppression."  Buchanon v. Maine, 469 F.3d 158, 178 (1st Cir. 2006) (emphasis in
original).  El Khoury "must show that the parties with whom [they] seek[] to be compared have
engaged in the same activity vis-a-vis the government entity without such distinguishing or
mitigating circumstances as would render the comparison inutile."  Cordi-Allen, 494 F.3d at 251.

El Khoury relies on the same evidence to support this claim as his due process claim.
Docket No. 124 at 16-17.  No reasonable juror could conclude, on the basis of the undisputed
facts of record, that El Khoury's claims are true.  He identifies no other individuals as
comparators, in other words, individuals who are situated similarly in all relevant aspects to him.
A reasonable jury could not infer that El Khoury was singled out for unlawful oppression.  He
therefore has not shown a violation of his constitutional rights.  Accordingly, this Court
recommends that Judge Sorokin grant summary judgment in favor of the Weston Defendants on
the "class of one" equal protection claim.

### 4.  Count III - Section 1983 Conspiracy Claim

El Khoury brings a Section 1983 conspiracy claim against Bousios and Goulding.
Docket No. 1-1 at 23.  He alleges they conspired to falsely obtain the 209A order and to invent a
crime of assault and battery to cover up their misconduct.  Id.  A Section 1983 conspiracy claim

is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (abrogated in part on other grounds by Maldonado v. Fontanes, 568 F.3d 263) (citation omitted). A plaintiff must establish "not only a conspiratorial agreement but also an actual abridgment of some federally-secured right." Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001) (citation omitted). Further, the plaintiff must specify the specific constitutional right infringed.

El Khoury has presented no admissible evidence of an agreement between defendants Bousios and Goulding from which a reasonable jury could infer a conspiracy among them. Indeed, El Khoury has not provided any admissible evidence that Goulding was meaningfully involved in any of the events giving rise to this claim. He only presents his own unsupported assertions that fail to show any communication, let alone an agreement, between Bousios and Goulding with respect to the incidents that led to this case. In addition, there is no evidence that the defendants committed acts that violated El Khoury's constitutional rights. Accordingly, this Court recommends that Judge Sorokin grant summary judgment in favor of the Weston Defendants on the conspiracy claim.[139]

B.    Count IV – Abuse Of Process

El Khoury alleges that Carlo, at Goulding's direction, filed an application for a criminal complaint against El Khoury, and that in so doing, both Carlo and Goulding engaged in abuse of

---

[139]  The Weston Defendants argue that Goulding and Bousios are entitled to qualified immunity with respect to El Khoury's Section 1983 claims. Docket No. 121 at 3-5. The qualified immunity doctrine provides public officials an immunity from suit and not a mere defense to liability. Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). However, because El Khoury's Section 1983 claims fail as a matter of law, this Court need not reach the question of qualified immunity.

process.  Docket No. 1-1 at 23-24.  El Khoury further alleges that Bousios also engaged in abuse of process by fabricating evidence against him.  Id.  El Khoury contends that the application for criminal charges was made for the improper purpose of covering up misconduct related to the issuance of the abuse prevention order and to gain "leverage over [El Khoury] against any potential civil claims he could bring against them for violating his civil rights on May 24, 2020 and for assaulting him by Officer Holmes on June 2, 2020."  Id. at 24; Docket No. 124 at 20.

To sustain an abuse of process claim, El Khoury must establish that "process was used 'to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.'"  Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 636 (2010) (quoting Quaranto v. Silverman, 345 Mass. 423, 426 (1963)).  Thus, the three elements of abuse of process are (1) "process" was used, (2) for an ulterior or illegitimate purpose, (3) resulting in damage.  Id. (citations omitted); Gutierrez v. Massachusetts Bay Transportation Authority, 437 Mass. 396, 407 (2002) (citations omitted); Jones v. Brockton Public Markets, Inc., 369 Mass. 387, 389 (1975).

The tort differs from malicious prosecution because abuse of process may exist "regardless of whether there was probable cause or whether the proceedings terminated in favor of the charged party."  Santiago v. Fenton, 891 F.2d 373, 388 (1st Cir. 1989); see Gutierrez, 437 Mass. at 408 ("probable cause is irrelevant to an abuse of process claim"); see also Fishman v. Brooks, 396 Mass. 643, 652 (1986) (proving "groundlessness of an action is not an essential element for an action for abuse of process").

"Process" refers to "the papers issued by a court to bring a party or property within its jurisdiction."  Jones, 369 Mass. at 390.  Massachusetts courts have limited process to three types: writs of attachment, the process used to institute a civil action, and the process related to the bringing of criminal charges.  Id. at 389-90.

It is undisputed that Carlo filed an application for a criminal complaint against El Khoury.[140]  El Khoury does not point to any evidence that Bousios or Goulding were involved in drafting or filing the application for criminal charges against him.  Indeed, Carlo specifically denied that Goulding ordered him, directly or indirectly, to file the application for a criminal complaint.[141]  In other words, there are no undisputed facts that show that either Bousios or Goulding used "process" against El Khoury.  Accordingly, this Court recommends that Judge Sorokin grant on this basis the Weston Defendants' motion for summary judgment as to El Khoury's claims of abuse of process against Goulding and Bousios.

El Khoury notes that Carlo admits that the photo of Cummings' arm, which was attached to the summons report, was included with the summons report that Carlo filed in support of his application for a criminal complaint against El Khoury.[142]  He also notes that, when asked about the photo at the May 14, 2021 hearing, Carlo stated that he was not sure what it depicted and that the copy of the summons report he had with him did not include the photo.[143]  In addition, El Khoury states that during a phone call with Carlo on November 9, 2020, Carlo read out loud from the summons report and stopped reading when he reached the word "not" in the sentence indicating that there were no obvious markings or bruising on Cummings' arm where she indicated she had been grabbed.[144]  From all this, El Khoury concludes that "it can be inferred that Det. Carlo did not bring with him the photo of Cummings' arm for the hearing, since he had not been aware, prior to filing the report with the court on July 14, 2020, that officer Broughton's narrative stated that she 'did not notice any obvious markings.'"  Docket No. 124 at 20

---

[140] Def. SOF ¶ 26; Pl. Resp. ¶ 26; Docket No. 135-11 at 1-2.
[141] Docket No. 135-11 at 2.
[142] Docket No. 124 at 19; Pl. SOF ¶ 111; Def. Resp. ¶ 111.
[143] Docket No. 124 at 19; Pl. SOF ¶ 112; Def. Resp. ¶ 112.
[144] Docket No. 124 at 19; Pl. SOF ¶ 113; Def. Resp. ¶ 113.

(emphasis in original).

Construing El Khoury's theory liberally, he appears to argue that Carlo presented the complaint on the assumption that Cummings had a visible injury at the time she reported to the WPD.  Even if Carlo was unaware that Broughton's narrative stated that she did not notice any obvious markings or bruising on Cummings' arm, that does not show that Carlo filed an application for a criminal complaint against El Khoury for any untoward reason.  Carlo's role within the WPD was that of court prosecutor.  Docket No. 135-11 at 1.  El Khoury presents no evidence showing that Carlo filed the application to prevent him from, for example, speaking at any hearing.

Accordingly, this Court recommends that Judge Sorokin grant the Weston Defendants' motion for summary judgment as to El Khoury's claims of abuse of process.

C.      Count V – Malicious Prosecution

El Khoury alleges that Carlo, under Goulding's direction, filed an application for a criminal complaint without probable cause.  Docket No. 1-1 at 24.  El Khoury also alleges that Bousios fabricated and omitted evidence.  Id.

Under Massachusetts law, the elements of malicious prosecution are "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice."  Nieves, 241 F.3d at 53.

1.   Initiation Of Criminal Proceedings

For the first element, "the defendant must have, in some sense, initiated the prosecution. The mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held sufficient to support an action for malicious prosecution."  Correllas v. Viveiros, 410 Mass. 314,

318 (1991) (citation omitted).

Courts in this district disagree about whether the filing of an application for a criminal complaint, without the issuance of the complaint, suffices to initiate a criminal proceeding for the purposes of a claim of malicious prosecution.  In <u>Fletcher v. Wagner</u>, the court held that "[i]n this admittedly cloudy environment, the stronger authority appears to be that in Massachusetts a claim for malicious prosecution will only lie if a criminal complaint actually issues.  Mere application for a complaint will not be enough."  <u>Fletcher v. Wagner</u>, 221 F. Supp. 2d 153, 155 (D. Mass. 2002).  In <u>Damon v. Hukowicz</u>, however, the court held that "[i]n the case at bar, [the police officer] clearly instituted the criminal proceedings against Plaintiff by filing the application for a criminal complaint."  <u>Damon v. Hukowicz</u>, 964 F. Supp. 2d 120, 137 (D. Mass. 2013).  For the purposes of this analysis, this Court follows the <u>Damon</u> court's more inclusive view.  Therefore, because it is undisputed that Carlo filed an application for a criminal complaint against El Khoury, El Khoury meets the first element.[145]

El Khoury, however, has offered no evidence that Goulding or Bousios encouraged or demanded that Carlo institute criminal proceedings against El Khoury.  Both Carlo and Goulding deny that Goulding was involved with the filing of the application.[146]  In addition, El Khoury has presented no admissible evidence from which a reasonable jury could infer that Bousios took part in the filing of the application.   Accordingly, this Court recommends that Judge Sorokin grant the Weston Defendants' motion for summary judgment as to El Khoury's claims of malicious prosecution against Goulding and Bousios.

2.  <u>Actual Malice</u>

"To raise a genuine issue of material fact on the question of malice, the plaintiff must

---

[145] Def. SOF ¶ 26; Pl. Resp. ¶ 26; Docket No. 135-11 at 1-2.
[146] Docket No. 135-11 at 2; Docket No. 135-12 at 1.

come forward with some evidence that would permit a fact finder to conclude that [the defendant] (1) knew there was no probable cause, and (2) acted with an improper motive, i.e., acted primarily for a purpose other than that of properly adjudicating the claim." <u>Sklar v. Beth Israel Deaconess Medical Center</u>, 59 Mass. App. Ct. 550, 557 (2003) (internal quotation marks and citations omitted). "'[I]mproper motive may be one of vexation, harassment, annoyance, or attempting to achieve an unlawful end or a lawful end through an unlawful means.'" <u>Chervin v. Travelers Ins. Co.</u>, 448 Mass. 95, 109 (2006) (citation omitted).

El Khoury has offered no admissible evidence to show that Carlo acted with an improper motive in filing the application for a criminal complaint. In his memorandum, El Khoury refers only to Bousios and Goulding. Specifically, El Khoury states:

> As for the element of "Malice", it could be inferred from actions in which Sergeant Bousios falsified the summons report, fabricated evidence and facts, conspired with Goulding to violate the civil rights of the plaintiff through the issuance of the Abuse Prevention order on May 24, 2020, and through all other actions detailed earlier through this Memorandum.

Docket No. 124 at 25. El Khoury points to nothing in the record to indicate that Carlo's actions meet the definition of malice for the purposes of a malicious prosecution claim. Furthermore, a plaintiff must show that the defendants knew there was no probable cause. Here, El Khoury has provided no such evidence. Indeed, a clerk-magistrate found probable cause.[147]

Accordingly, this Court recommends that Judge Sorokin grant the Weston Defendants' motion for summary judgment as to El Khoury's claim of malicious prosecution against Carlo.

D.   <u>Count VI – Assault</u>

El Khoury claims that Officer Holmes assaulted him when she accompanied him to Cummings' house to collect his belongings on June 2, 2020. Docket No. 1-1 at 24. He appears

---

[147] Def. SOF ¶ 28. El Khoury disputes that the clerk-magistrate found probable cause. Pl. Resp. ¶ 28. His lengthy response, however, does not controvert the statement.

to allege two separate incidents of assault: (1) that he felt Officer Holmes was going to shoot him in Cummings' kitchen; and (2) that as he was rapidly descending a set of stairs, Officer Holmes suddenly jumped in front of him, blocking his way without touching him.  Id. at 10-11; Docket No. 124-1 at 9.  With respect to the second alleged incident, El Khoury asserts that while he was removing his belongings from Cummings' house:

> I was coming down the stairs quickly, Officer Holmes this time suddenly jumped in front of me, fully blocking my way to tell me again that I could have an additional five minutes. The way Officer Holmes suddenly positioned herself in front of me signaled that she was expecting me to collide with her or maybe to push her away from my way. Officer Holmes had her right hand on her gun when she blocked my way. I was lucky to avoid her with a miracle.

Docket No. 124-1 ¶ 23.[148]

Under Massachusetts' law "[c]ivil assault requires that a defendant 'act[ed] intending to cause a harmful or offensive contact' with a plaintiff, 'or [acted to create] an imminent apprehension of such a contact,' and that a plaintiff was 'thereby put in such imminent apprehension.'"  Diaz v. Devlin, No. CV 16-40039-TSH, 2019 WL 4804803, at *6 (D. Mass. Sept. 30, 2019) (quoting Restatement (Second) of Torts § 21 (1) (Am. Law Inst. 1965)) (additional citations omitted).  Massachusetts law allows for assault claims against police officers.  Raiche v. Pietroski, 623 F.3d 30, 40 (D. Mass. 2010).  However, police officers are allowed to use reasonable force, which provides a valid defense to assault and battery claims.  Id  Courts look to the objective reasonableness of the officer's actions given the specific circumstances.  Titus v. Town of Nantucket, 840 F. Supp. 2d 404, 413-14 (D. Mass. 2011).  "[T]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. at 414

---

[148] El Khoury also claims that Goulding directed Holmes to assault El Khoury.  Docket No. 1-1 at 25.  However, he provides no evidence showing Goulding's involvement in the alleged acts of assault.  For this reason alone, summary judgment should be granted for Goulding on this claim.

(citation and quotation marks omitted).[149]

Here, a judge had issued a 209A order against El Khoury.  He had been directed to stay away from Cummings.  He was only allowed back into the house to retrieve his belongings under police escort.  While El Khoury was in the house, Officer Holmes heard loud noises that sounded like large objects being thrown around, so she went upstairs to determine the cause of the noise.  Docket No. 135-7 at 2-3.  Even if Officer Holmes had placed her hand on her gun and blocked El Khoury's way, her actions at that time were reasonable given that she was there to ensure the safety of everyone.  Construing the facts in the light most favorable to El Khoury, no reasonable juror could find that Officer Holmes committed assault.

Accordingly, I recommend that Judge Sorokin deny El Khoury's motion for summary judgment and grant the Weston Defendants' motion for summary judgment as to El Khoury's claims of assault as to Holmes and Goulding.

E.    Count VII – Civil Rights Claim Pursuant To The Massachusetts Civil Rights Act

On June 2, 2020, when El Khoury went to retrieve his belongings, he was surprised by Cummings' presence.  El Khoury alleges that he was led to believe that Cummings would not be at the house when he collected his belongings, so when she was present, it felt like a trap "to justify harming [him]".  Docket No. 1-1 at 24-25.  El Khoury also alleges that Goulding ordered Holmes to assault him, "either with the intent to kill or threaten or harm [him] in some other way" to prevent him from testifying at his next court hearing.  Id. at 25.

The MCRA provides, in relevant part:

Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation

---

[149] The pertinent cases focus on assault and battery claims.  Indeed, there are very few cases in which a plaintiff alleges assault alone against a police officer.  Nevertheless, there is no reason to believe that the logic of a reasonableness determination with respect to a police officer's conduct should not be applied with equal force to a stand-alone assault claim.

> or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured.

M.G.L. c. 12, § 11H.  The MCRA authorizes civil actions by any person subjected to an interference of rights as described in Section 11H.  Mass. Gen. Laws. ch. 12 § 11I.  To prevail, El Khoury "must prove that (1) [his] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'"  Bally v. Northeastern Univ., 403 Mass. 713, 717 (1989) (quoting Mass. Gen. Laws ch. 12, § 11H).  "The MCRA is coextensive with 42 U.S.C. § 16 1983, except that the Federal statute requires State action whereas its State counterpart does not, and the derogation of secured rights must occur by threats, intimidation or coercion."  Sietins v. Joseph, 238 F. Supp. 2d 366, 377-78 (D. Mass. 2003) (quotations and citations omitted).  This additional requirement distinguishes valid claims under the MCRA from those under Section 1983.

The MCRA "was not intended to create, nor may it be construed to establish, a vast constitutional tort."  Mancuso v. MIAA, Inc., 453 Mass. 116, 131-132 (2009) (internal quotation marks and citation omitted).  "It is for this reason that the Legislature explicitly limited the Act's remedy to situations where the derogation of secured rights occurs by threats, intimidation, or coercion."  Id. at 132.  "A direct violation of civil rights is not, without a showing of coercive behavior, actionable."  Orwat v. Maloney, 360 F. Supp. 2d 146, 164 (D. Mass. 2005) (quotation omitted).

For purposes of the MCRA, "a 'threat' involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.  'Intimidation' involves putting in fear

for the purpose of compelling or deterring conduct.  'Coercion' involves the application to

another of such force, either physical or moral, as to constrain a person to do against his will

something he would not otherwise have done."  Farrah v. Gondella, 725 F. Supp. 2d 238, 247 (D.

Mass. 2010) (quoting Planned Parenthood League of Massachusetts v. Blake, 417 Mass. 467,

474 (1994)).

Here, the record is devoid of any evidence of threats, intimidation, or coercion by

Goulding.  With respect to Holmes, El Khoury argues that she "intimidated [him] and threatened

his personal safety and security when he was picking up his remaining be longings."  Docket No.

124 at 29.  El Khoury does not, however, identify any specific constitutional right that he claims

was violated during this incident.

Viewing the evidence in the light most favorable to El Khoury, Officer Holmes jumped

in front of him with her hand on her firearm and blocked his way to inform him he could have

additional time to collect his things.  There is no evidence in the record to support the allegation

that Officer Holmes' actions were intended to prevent him from testifying in court.  Nothing in

El Khoury's version of the events shows that Officer Holmes was attempting to threaten,

intimidate, or coerce El Khoury in order to cause him to give up a constitutional right.

Accordingly, this Court recommends that the Judge Sorokin grant summary judgment in

favor of the Weston Defendants on El Khoury's MCRA claim.[150]

F.     Count IX – Intentional Infliction Of Emotional Distress

To prevail on a claim of intentional infliction of emotional distress, El Khoury must

prove that (1) the Weston Defendants either intended to inflict emotional distress, or knew or

---

[150] The Weston Defendants also move for summary judgment on the basis of qualified immunity with respect to El Khoury's MCRA claim.  Docket No. 121 at 18.  However, because El Khoury's MCRA claim fails as a matter of law, this Court need not reach the question of qualified immunity.

should have known that emotional distress was the likely result from their conduct; (2) the Weston Defendants' conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized society; (3) the Weston Defendants' conduct caused El Khoury's emotional distress; and (4) the emotional distress suffered by El Khoury was severe and of a nature that no reasonable person could be expected to endure it.  See Conley v. Romeri, 60 Mass. App. Ct. 799, 803 (2004).  The Massachusetts Supreme Judicial Court has explained that

> Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions or other trivialities nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997) (internal quotation marks and citations omitted).

The test for intentional infliction of emotional distress is demanding and requires behavior that is "extreme and outrageous . . . beyond all possible bounds of decency and . . . utterly intolerable in a civilized society."  Conley, 60 Mass. App. Ct. at 803.

Examples of successful IIED claims include instances of "relentless" and "pernicious" verbal and written attacks over a "more than four-year long war of vituperation" waged against the plaintiff  which included "vicious and extraordinarily disturbing emails and text messages" (Sindi v. El-Moslimany, 896 F.3d 1, 22 (1st Cir. 2018), and government officials knowingly implicating innocent individuals in a murder, including by acting deliberately in order to lead to the wrongful conviction and incarceration and stonewalling the individuals' petitions for post-conviction relief.  Limone v. United States, 579 F.3d 79 (1st Cir. 2009).

The kind of behavior described above is not present in this case.  El Khoury's allegations

for this claim rely heavily on his charges of false documents and conspiracies, none of which are supported by the undisputed facts.  Having reviewed the record carefully, this Court finds that there is no genuine issue of material fact that the Weston Defendants' behavior was extreme and outrageous.

Accordingly, this Court recommends that Judge Sorokin grant the Weston Defendants' motion for summary judgment as to El Khoury's claim for intentional infliction of emotional distress.

V.   RECOMMENDATION

For the foregoing reasons, I recommend that Judge Sorokin grant the Weston Defendants' motion for summary judgment and deny El Khoury's motion for summary judgment.[151]

VI.   REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of service of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1 (1st Cir. 1999);

---

[151] Even if Judge Sorokin adopts this Court's recommendation as to the Weston Defendants' motion for summary judgment, this case is not fully resolved because El Khoury's claims against defendant Cummings remain outstanding.

<u>Sunview Condo. Ass'n v. Flexel Int'l, Ltd.</u>, 116 F.3d 962 (1st Cir. 1997); <u>Pagano v. Frank</u>, 983

F.2d 343 (1st Cir. 1993).


/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge